UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CASSIE SOMERS AND JOLIA GEORGES, INDIVIDUALLY AND AS THE REPRESENTATIVE OF A CLASS OF SIMILARLY SITUATED PERSONS, AND ON BEHALF OF THE CAPE COD HEALTHCARE 403(B) PARTNERSHIP PLAN,<br><br>          Plaintiffs,<br><br>          v.<br><br>CAPE COD HEALTHCARE, INC. AND JOHN AND JANE DOES 1-10,<br><br>          Defendants. | Civil Action No. 1:23-cv-12946-MJJ |

**MEMORANDUM OF DECISION**

August 30, 2024

JOUN, D.J.

    Cassie Somers ("Ms. Somers") and Jolia Georges ("Ms. Georges") have filed suit, individually and on behalf of a proposed class of similarly situated participants and beneficiaries of the Cape Cod Healthcare Retirement Plan (collectively, "Plaintiffs"), against Cape Cod Healthcare, Inc. ("Cape Cod Healthcare"), and John and Jane Does 1-10 (collectively, "Defendants") for Breach of Fiduciary Duty of Prudence in violation of 29 U.S.C. § 1104(a)(1)(B), also known as the Employee Retirement Income Security Act of 1974 ("ERISA"), as well as Failure to Monitor Fiduciaries. [Doc. No. 8]. Plaintiffs allege that Defendants, as fiduciaries of the Cape Cod Healthcare Retirement Plan, failed to ensure that

participants had appropriate investment options and failed to ensure that the fees they pay for services are reasonable.

On February 9, 2024, Defendants filed a Motion to Dismiss. [Doc. No. 12]. The matter was fully briefed, and a hearing was held on July 31, 2024. [Doc. No. 30]. For the reasons set forth below, Defendants' Motion to Dismiss is DENIED.

## I.  BACKGROUND

The following facts are drawn from the Amended Complaint, taken as true for purposes of evaluating Defendants' Motion to Dismiss. *See Ruivo v. Wells Fargo Bank*, 766 F.3d 87, 90 (1st Cir. 2014). In addition to the Amended Complaint, the Court also considers those documents "sufficiently referred to" or incorporated by it. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).[1]

Ms. Somers and Ms. Georges are former employees of Cape Cod Healthcare who participated in the Cape Cod Healthcare Retirement Plan (the "Plan"), a 403(b) plan,[2] during the putative class period.[3] [Doc. No. 8 at ¶¶ 3, 17-18]. Cape Cod Healthcare is a Plan sponsor, Plan administrator, and named fiduciary of the Plan, and as such "has the ultimate authority to control and manage the operation and administration of the Plan" pursuant to 29 U.S.C. § 1102(a). [*Id*. at ¶¶ 22, 24-25]. As a 403(b) defined contribution or individual account plan within the meaning of 29 U.S.C. 1002(34), and as an employee pension benefit plan within the meaning of 29 U.S.C. §

---

[1] These documents, submitted as Exhibits 1-34 to the Declaration of Benjamin S. Reilly in Support of Defendants' Motion to Dismiss [Doc. No. 14], include relevant U.S. Department of Labor Form 5500s ("Form 5500s") and select plan documents—materials which are "routinely considered on motions to dismiss in the ERISA context." *Velazquez v. Mass. Fin. Servs. Co*., 320 F. Supp. 3d 252, 255 n.1 (D. Mass. 2018).

[2] A 403(b) plan "is an employer-sponsored defined contribution (DC) retirement plan that enables employees of public schools and universities, nonprofit employers, and church organizations to make tax-deferred contributions from their salaries to the plan." [Doc. No. 8 at ¶ 2 n.1].

[3] The putative class that Plaintiffs seek to represent is defined as:
"All persons, except Defendants and their immediate family members, who were participants in, or beneficiaries of the Plan, at any time between December 1, 2017 through the date of judgment (the 'Class Period')." [Doc. No. 8 at ¶ 90].

1002(2)(A), the Plan allows participants to directly invest in a selection of over 75 mutual fund and other options; however, the Plan's fiduciaries also play a role in selecting and monitoring recordkeeping providers and Plan investments. [*Id.* at ¶¶ 29, 38, 48].

### A. Recordkeeping Fees

Lincoln Retirement Services Company LLC ("Lincoln") "provides the Plan a set of administrative services, such as tracking participants' account balances and sending participant communications, that collectively are described as 'recordkeeping.'" [*Id.* at ¶¶ 50-51]. Cape Cod Healthcare arranged for recordkeeping to be paid from the Plan's assets, such that payments are made directly or through revenue sharing. [*Id.* at ¶ 51]. In other words, investments within the Plan make payments to the recordkeeper or to the Plan directly for recordkeeping costs. [*Id.*].

In 2022, on a per-participant basis, direct recordkeeping compensation paid to Lincoln equaled $70.56 for each of the 6,746 Plan participants with account balances. [*Id.* at ¶ 54-55]. This amount was calculated by dividing Lincoln's total direct compensation reported on the Plan's Form 5500 ($475,977 in 2022) by the number of participants at year-end (6,746 in 2022). [*Id.* at ¶¶ 54-55; Doc. No. 14-12 at 3, 5]. The $70.56 amount does not take into account any expenses reallocated back to participants or any additional indirect compensation (i.e., revenue sharing) that had been received by Lincoln. [Doc. No. 8 at ¶¶ 54, 62 n.17]. Below is a chart of per-participant recordkeeping fees paid during the Class Period using the above formula.

| Year | Per-Participant Fee |
|------|---------------------|
| 2022 | $70.56 |
| 2021 | $85.32 |
| 2020 | $55.90 |
| 2019 | $88.80 |
| 2018 | $90.96 |
| 2017 | $85.26 |

[*Id*. at ¶ 56; Doc. No. 14-7 at 2-9; Doc. No. 14-8 at 2-9; Doc. No. 14-9 at 2-9; Doc. No. 14-10 at 2-9; Doc. No. 14-11 at 2-9; Doc. No. 14-12 at 2-9].

NEPC, a consulting group, surveyed defined contribution plans and reported that per-participant fees decreased as plan sizes increased and that half of surveyed plans with between 5,000 and 15,000 participants paid between approximately $40 and $55 per participant in recordkeeping fees; little or no similar plans in the survey paid above $70. [*Id*. at ¶¶ 58-59].

### B. Investment Options

As a fiduciary of the Plan, Cape Cod Healthcare was also responsible for monitoring the various investment options made available to Plan participants. [*Id*. at ¶ 73]. As of December 31, 2022, the options with the most significant participant assets invested, excluding target date funds, were the following: Lincoln Financial Group Stable Value Fund, Vanguard Institutional Index Institutional Shares, American Funds Washington Mutual Investors Class R6, MFS Massachusetts Investors Growth Stock Class R6, Allspring Special Mid Cap Value, Clearbridge Small Cap Growth Class Is, Blackrock Total Return Class K Shares, MassMutual Select Mid Cap Growth Class I, and American Funds Europacific Growth Class R6. [*Id*.].

Each fund in the Plan has an associated "expense ratio," reflecting the fee investing participants are charged for investment management and other services. [*Id*. at ¶ 72]. The Plan's investment options carry a wide range of expense ratios. For example, the Allspring Special Mid Cap Value Fund charges a 0.7% expense ratio for investing in it, whereas the comparable fund Vanguard Mid-Cap Value Index Fund Admiral Shares charges a 0.07% expense ratio, and comparable fund Fidelity Mid Cap Value Fund K6 Fund charges 0.45%. [*Id*. at ¶ 74]. Below is a table of returns and costs for the above three funds.

| Fund | 10-Year Cost for $10,000 investment | 1-Year Return | 3-Year Return | 5-Year Return |
|---|---|---|---|---|
| Allspring Special Mid Cap Value Fund | $857.01 | 0.60% | 12.29% | 9.08% |
| Fidelity Mid Cap Value K6 Fund | $566.15 | 3.11% | 13.59% | 6.80% |
| Vanguard Mid-Cap Value Index Fund | $89.89 | -3.53% | 9.69% | 6.17% |

[*Id*. at ¶ 75].

Similarly, the American Funds Washington Mutual Investors fund pays a 0.27% expense ratio. [Doc. No. 14-5 at 8]. Whereas the Fidelity Total Market Index Fund and Vanguard Russell 1000 Index Fund Institutional Shares—two options in the same Morningstar category as American Funds, with the same Morningstar rating—have expense ratios of 0.02% and 0.07%, respectively. [Doc. No. 8 at ¶ 78]. Below is a table of returns and costs for the above three funds.

| Fund | 10-Year Cost for $10,000 investment | 1-Year Return | 3-Year Return | 5-Year Return |
|---|---|---|---|---|
| American Funds Washington Mutual Investors fund | $342.99 | 6.82% | 12.35% | 9.89% |
| Fidelity Total Market Index Fund | $19.32 | 8.42% | 9.07% | 10.11% |
| Vanguard Russell 1000 Index Fund Institutional | $89.89 | 9.43% | 9.47% | 10.65% |

[*Id*. at ¶ 79].

The Plan's most popular investment option is the Lincoln Financial Group Stable Value Fund ("Lincoln SVF"), which has the most significant amount of participant assets invested in it at $174,538,696 as of 2022—amounting to nearly a quarter of participants' assets. [*Id*. at ¶¶ 73, 83; Doc. No. 14-12 at 20]. As of December 31, 2022, the Lincoln SVF provided a guaranteed

5

minimum interest rate of one percent and a portfolio rate of 2.3 percent. [Doc. No. 8 at ¶ 84]. These rates are far below the rate of inflation. [*Id*. at ¶ 85]. In contrast, Lincoln's own retirement plan for its employees listed the guaranteed minimum interest rate for the Lincoln SVF to be 3 percent and a portfolio rate of 3 percent. [*Id*. at ¶ 86].

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up). The court must "assume the truth of all well-pleaded facts and indulge all reasonable inferences that fit the plaintiff's stated theory of liability." *Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev.*, 421 F.3d 1, 5 (1st Cir. 2005) (cleaned up).

## III. ANALYSIS

### A. <u>Standing</u>

Defendants argue that Ms. Somers and Ms. Georges both lack standing because they did not allege that they invested in any of the challenged funds[4]; neither Ms. Somers nor Ms. Georges alleges the recordkeeping fees paid, or that such fees exceeded what is claimed to be a reasonable fee to plead any injury-in-fact. [Doc. No. 13 at 12-13]. Specifically, Ms. Somers paid recordkeeping fees amounting to $0.38 across two years, which falls well below the range of $23

---

[4] The challenged funds are the Allspring Special Mid Cap Value Fund, the American Funds Washington Mutual Investors Fund, and the Lincoln SVF.

to $55 per year pled as reasonable in the Amended Complaint. [*Id.* at 12]. However, despite Defendants' arguments, "[i]t is well-established that for the purpose of constitutional standing, a plaintiff need not have invested in each fund at issue, but must merely plead an injury implicating defendants' fund management practices." *Velazquez v. Mass. Fin. Servs. Co.*, 320 F. Supp. 3d 252, 257 (D. Mass. 2018) (cleaned up). Here, Plaintiffs allege that Defendants failed to ensure that participants in the Plan had appropriate investment options and failed to ensure that the fees they pay for Plan services are reasonable, which directly implicates Defendants' fund management practices. [Doc. No. 8 at 1]. Furthermore, Plaintiffs allege the Plan and its participants suffered millions of dollars in losses as a consequence of Defendants' fiduciary breaches. [*Id.* at ¶ 107]. Thus, Plaintiffs have established constitutional standing. *See Khan v. PTC, Inc.*, No. 20-cv-11710, 2021 WL 1550929, at *3 (D. Mass. Apr. 20, 2021) (allegations including that fiduciaries "failed to investigate and select lower-cost alternative funds" and "to monitor and control the Plan's recordkeeping expenses" were "sufficient to plead that the Plan suffered an injury in fact and, under the majority approach . . ., to permit [plaintiffs] to pursue their claims on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2)").

    **B.**    **Duty of Prudence**

ERISA was designed by Congress to "promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). Specifically, ERISA imposes duties of loyalty and prudence on plan fiduciaries, 29 U.S.C. § 1104(a)(1)(A)-(B), and fiduciaries are liable for breach of such duties, 29 U.S.C. § 1109(a). "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C.

§ 1104(a)(1)(A). Furthermore, a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id*. at § 1004(a)(1)(B). The test of prudence "is one of conduct, and not a test of the result of performance of the investment." *Barchock v. CVS Health Corp.*, 886 F.3d 43, 44 (1st Cir. 2018) (cleaned up).

"A claim for breach of a fiduciary duty under ERISA includes proving a breach, a loss, and the causal connection between the two." *Parmenter v. Prudential Ins. Co. of Am.*, 93 F.4th 13, 19 (1st Cir. 2024) (cleaned up). "[T]here can be no breach of a particular duty if a party does not owe that duty to the plaintiff in the first place." *Id*.

### 1. Recordkeeping Fees

Here, the parties do not dispute that Defendants are fiduciaries of the Plan. Rather, Plaintiffs allege the per-participant recordkeeping fees paid to Lincoln were higher for most of the Class Period under the Plan than under plans with comparable participant counts and/or asset amounts, evidencing that Defendants' process for monitoring the Plan's recordkeeping fees was imprudent. [Doc. No. 8 at ¶¶ 56-57]. Specifically, comparable plans, as evidenced by survey results from consulting group NEPC, averaged $40 to $55 in recordkeeping fees per participant, while the Plan's recordkeeping fee per participant was $70.56 in 2022, and higher than $70.56 for most of the class period. [*Id*. at ¶¶ 55-59]. Plaintiffs also allege that Defendants engage in revenue sharing, which may hide the true scope of fees and likely lead to underreporting of the compensation figures on the Plan's Forms 5500. [*Id.* at ¶¶ 52-53]. Finally, Plaintiffs allege that Defendants failed to conduct Requests for Proposal ("RFPs") at reasonable periods when the

Plan retained the same recordkeeper during the Class Period and continued paying the excessive fees. [*Id.* at ¶ 68].

"Fiduciaries have a general duty to monitor recordkeeping expenses and, more generally, they have a prudential duty to be cost-conscious in the administration of a plan." *Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 136 (D. Mass. 2021). Breach of the duty of prudence can be found where a fiduciary fails to diligently monitor and investigate recordkeeping fees. *Id.* (cleaned up). Here, Plaintiffs' assertion that Defendants demonstrated imprudent monitoring by subjecting Plan participants to recordkeeping fees at prices well higher than those of comparable plans is sufficient at this stage to survive dismissal. *See Sellers v. Trustees of Coll.,* 647 F. Supp. 3d 14, 26 (D. Mass. 2022) (cleaned up) ("[I]n ERISA cases, plaintiffs often lack access to all information needed to assert complete factual allegations and therefore, reasonable inferences from facts available to them are sufficient to state a claim").

Defendants argue that Plaintiffs fail to allege the Plan's actual recordkeeping fees, fail to compare the Plan's fees to any meaningful benchmark, and merely state conclusory allegations that Defendants failed to conduct RFPs at reasonable periods. [Doc. No. 13 at 20-26]. These arguments miss the mark. First, Defendants claim the Plan's average per-participant recordkeeping fees were between $45 and $60, and thus fall within the ranges identified by Plaintiffs as reasonable. [*Id.* at 21-22]. Defendants reach this range by multiplying the recordkeeping fee rate for each year by the total dollar amount of assets and dividing that amount by the total number of participants. [*Id.*]. At this stage, Plaintiffs' allegations are sufficient to survive dismissal; the Court does not delve into the parties' differing formulas to determine recordkeeping fees, especially where there remains ambiguity regarding how much Lincoln

9

received through indirect compensation and where Plaintiffs allege that, even after subtracting revenue credit, the Plan's fees remain unreasonable. [Doc. No. 8 at ¶ 62 n.17].

Secondly, Defendants also argue that Plaintiffs' comparison of the Plan's fees to those of NEPC-surveyed plans, *Sellers*, and *Brown* provide only a naked fee-to-fee comparison without regard for the quality or level of services from which to draw a meaningful comparison. [Doc. No. 13 at 23]. Again, Defendants ask the Court to engage in a factual analysis, inappropriate at a motion to dismiss stage. Here, Plaintiffs allege the Plan had similar asset amounts and participant counts to the median plan of the NEPC report, yet the report found lower recordkeeping fees under comparable plans. [Doc. No. 8 at ¶¶ 58-59]. Such assertions are sufficient to survive dismissal. *See In re Biogen, Inc. v. ERISA Litig.*, No. 20-cv-11325, 2021 WL 3116331, at *6 (D. Mass. July 22, 2021) ("Disputes over the appropriateness of these benchmarks…are inappropriate at the motion to dismiss stage"). Finally, failure to conduct RFPs may demonstrate a breach of the duty of prudence. *See Turner,* 530 F. Supp. 3d at 137 (quoting *Tracey v. Mass. Inst. of Tech.*, No. 16-cv-11620, 2017 WL 4478239, at *3 (D. Mass. Oct. 4, 2017)) ("As part of the 'prudent man standard' one would expect a fiduciary to obtain bids at some point").

### 2. Underperformance of Challenged Funds

Plaintiffs additionally claim that the Plan's investments were more expensive and returned less than comparable options found in similarly sized plans. [Doc. No. 8 at ¶ 71]. For example, the Allspring Special Mid Cap Value Fund (the "Allspring Fund") charges participants a 0.7% expense ratio for investing in it, while comparable funds charge lower expense ratios, including the Vanguard Mid-Cap Value Index Fund Admiral Shares' charge of 0.07% and the Fidelity Mid Cap Value K6 Fund's charge of 0.45%—with the latter fund outperforming the Allspring Fund over both the one- and three-year period. [*Id.* at ¶ 74]. Similarly, the American

10

Funds Washington Mutual ("AFWM") Investors Fund (one of the Plan's most significant investment options) had a higher expense ratio than those of the comparable Fidelity Total Market Index Fund and the Vanguard Russell 1000 Index Fund Institutional Shares. [*Id.* at ¶ 78]. Plaintiffs allege that the higher cost of the Plan's funds would erase any performance advantage and heighten any performance disadvantage. [*Id.* at ¶ 75]. Plaintiffs also allege that Defendants did not substitute any of the most significant options in the Plan during the Class Period. [*Id.* at ¶ 81]. Finally, Plaintiffs allege the Lincoln SVF, the most significant investment option in the Plan, guarantees a minimum interest rate of only one percent as of December 2022—far lower than the rate of inflation—while Lincoln's own retirement plan for its employees guaranteed a threefold minimum interest rate at three percent for the same Lincoln SVF. [*Id.* at ¶¶ 84-86].

Defendants argue the Allspring Fund is pleaded to have significantly outperformed both of Plaintiffs' alternative funds over a five-year period; likewise, the AFWM fund is pleaded to have outperformed Plaintiffs' alternatives over a three-year basis, and performed similarly to the alternatives during the five-year period. [*Id.* at ¶¶ 75, 79; Doc. No. 13 at 13]. Additionally, the returns alleged are already net-of-fees, and Plaintiffs do not plead their alternatives are meaningful benchmarks. [Doc. No. 13 at 14-15; Doc. No. 14-29 at 6]. As stated previously, the Court will not delve into disputes regarding the appropriateness of benchmarks at this stage. *In re Biogen, Inc.*, 2021 WL 3116331, at *6. Moreover, while true that "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund … cost conscious management is fundamental to prudence in the investment function." *Turner,* 530 F. Supp. 3d at 134 (cleaned up). And, even though prudence "cannot be measured in hindsight … fiduciaries may still be held liable for assembling an imprudent menu of investment choices." *In re Biogen, Inc.*, 2021 WL 3116331, at *5 (cleaned up). Here, Plaintiffs allege Defendants do not appear to

have substituted any of the most significant options in the Plan during the Class Period, and cite several allegedly superior alternative options that were available on the market. [Doc. No. 8 at ¶¶ 80-81]. Moreover, Plaintiffs allege the most significant investment option in the Plan, the Lincoln SVF, carries a guaranteed minimum interest rate under Lincoln's own retirement plan that is three times higher than that offered to Plan participants. [*Id.* at ¶ 86]. Given these assertions, the Plaintiffs have alleged sufficient facts to survive dismissal at this stage.

### C. Failure to Monitor

Plaintiffs allege Defendants breached their fiduciary duties by failing to monitor and evaluate the performance of individuals appointed to monitor and administer the Plan and failing to have a system in place for doing so; failing to monitor the processes by which those responsible selected and monitored Plan investments; and failing to remove administrators whose performance was inadequate as demonstrated by retaining imprudent, excessively costly, and poorly performing investments within the Plan and failing to properly monito recordkeeping fees. [*Id.* at ¶¶ 114-15]. For the same reasons stated above, and because the count supporting the underlying breach claim proceeds, so too does the derivative claim of failure to monitor survive. *See Tracey*, 2017 WL 4478239, at *4 ("[P]laintiffs' claims for failure to monitor [will] continue insofar as they derive from plaintiffs' other claims").

### IV.   CONCLUSION

For the above reasons, Defendants' Motion to Dismiss is DENIED.

SO ORDERED.

/s/ Myong J. Joun
United States District Judge